UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:05CR0077 SNL (AGF) |
| SCOTT SALMAN and | ) | |
| DARYL WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motions filed by Defendants Scott

Salman ("Salman") and Daryl Williams.  Pretrial matters were referred to the undersigned

United States Magistrate Judge under 28 U.S.C. § 636(b).  Defendant Salman filed a

motion to sever, motion to suppress contents of electronic surveillance, and an amended

motion to suppress electronic evidence (Doc. Nos. 46, 59, & 63, respectively).

Defendant Daryl Williams filed motions to suppress statements, to suppress tangible

evidence, for disclosure of any agreements with witnesses, for leave to file additional pre-

trial motions, and to suppress the contents of any wiretap orders (Doc. Nos. 66, 67, 68,

69 & 70, respectively).  The trial is scheduled for Monday, July 11, 2005, at 9:30 a.m.

An evidentiary hearing was held on May 4, 2005.  The government was

represented by Assistant United States Attorney John J. Ware.  Defendant Salman was

present and represented by his attorney, L. Steven Goldblatt.  Defendant Williams was

present and represented his attorney, Vanessa C. Antoniou.

At the hearing, Defendant Salman withdrew all motions, other than his amended motion to suppress electronic surveillance. (Doc. No. 63). Defendant Salman further delimited this motion to two intercepted telephone calls, asserting that the government failed properly to minimize the interceptions.

Defendant Williams also withdrew his motions to suppress statements, tangible evidence, and the contents of any wiretap orders. (Doc. Nos. 66, 67, & 70). Based on the government's representation that it would disclose <u>Jencks</u> materials the Friday before trial, Defendant Williams also withdrew his motion for disclosure of any agreements with witnesses. (Doc. No. 68). Inasmuch as Defendant Williams identified no reason why he was unable to file pretrial motions on the schedule set by the Court, the Court indicated that it would deny Defendant's motion for additional time to file pretrial motions (Doc. No. 69), subject to a future motion for leave to file if such grounds were later presented. Though withdrawing all of his substantive written motions, Defendant Williams made an oral motion to suppress identification testimony. The government did not object. The Court therefore heard testimony on the issue at the evidentiary hearing, and Defendant thereafter filed a written motion to suppress the identification evidence. (Doc. No. 89).

As such, only two issues remained for determination at the evidentiary hearing: Defendant Scott Salman's motion to suppress two intercepted telephone calls, and Defendant Williams' motion to suppress identification evidence. With regard to Defendant Salman's motion to suppress electronic evidence, the government called Special Agent (SA) Dietrich Volk, who has been employed as an agent with the Federal Bureau of Investigation (FBI) for over 26 years. With regard to Defendant Williams'

motion to suppress identification, the government called Ryan Streck, a Special Officer with the FBI who had nine years of previous law enforcement experience with the St. Charles County Sheriff's Department. The witnesses were cross-examined by defense counsel. Following the testimony, Defendant Williams was given until May 9, 2005 to file a written motion and a post-hearing memorandum on the motion to suppress identification testimony, and the government was granted until May 13, 2005 to file a response. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In late fall, 2003, SA Volk and others were assigned to investigate a narcotics trafficking organization involving co-defendant Sayal Salman and others that was operating in the St. Louis metropolitan area and was allegedly based in El Paso, Texas, and Juarez, Chihuhua, Mexico. Co-defendant Sayal Salman is the brother of Defendant Scott Salman. The indictment charges that during 2002-2004, Defendants Scott Salman and Daryl Williams engaged in a conspiracy with Defendant Sayal Salman, other named defendants, other named individuals, and others unknown, to distribute in excess of 100 kilograms of marijuana, in violation of 21 U.S.C. § 846.

### A. Electronic Surveillance

In connection with their investigation, SA Volk filed an affidavit in support of an application for a wiretap, which is the subject of Defendant Salman's present motion. At the hearing, the government presented Government Exhibits 1-18, which reflect the

relevant wiretap applications, authorizations, and reports. Defendant Salman stipulated as to the authenticity, foundation, and admissibility of these exhibits. Defendant did not challenge the authorization to obtain the wiretaps or the probable cause therefor. Defendant's motion was limited to the government's post-authorization conduct; he contends that the agents did not properly minimize the interceptions and therefore should not have intercepted the two telephone calls he seeks to suppress. As such, the Court will describe the wiretap applications and orders in summary fashion and address in detail only those facts pertinent to Defendant's minimization argument.

The application for the interception of wire communications was filed on November 20, 2003. Gov't. Ex. 2. The application requested the interception of wire communications of Sayel Salman, David Cornell Greenwade, Elias Ponce, Francisco Mendoza, Saul Z. Aguirre, Rick LNU, two individuals known only by their nicknames, and others as yet unknown, to and from two cellular telephones: (314) 799-5874, subscribed to by Bobby Johnson and used by Sayel Salman (Telephone #1); and (314) 369-8546, subscribed to and used by Sayel Salman (Telephone #2). As set forth in the affidavit in support of the application, a wiretap of the telephone of Elias Ponce, previously authorized in El Paso, Texas, had intercepted telephone calls between Ponce and Sayel Salman, in which Sayel Salman used the target telephones. Those intercepted telephone calls, together with other aspects of their investigation, showed Sayal Salman to be a major purchaser of narcotics from Ponce, and that Sayal Salman used Telephone #1 and Telephone #2 to engage in conversations with Ponce and others related to

narcotics distribution.  The affidavit in support of the application does not mention Defendant Scott Salman.

The application was properly authorized by the Attorney General's office.  <u>See</u> Govt. Ex. 2.  The application and affidavit established probable cause for the interception and also demonstrated that normal investigative procedures had been unsuccessful, were unlikely to succeed, or were too dangerous to employ.  Defendant  Salman does not challenge these conclusions.

On November 20, 2003, an Order was executed by the Hon. E. Richard Webber, authorizing the interception for a period of 30 days.  Govt. Ex. 3.  The Order specifically provided that "interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged coconspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein," or for a period of thirty (30) days.  Govt. Ex. 3 at S000506.

With respect to minimization, the affidavit represented that all wire interceptions would be minimized in accordance with Chapter 119 of Title 18, U.S.C.  Specifically, it provided:

> Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named TARGET INTERCEPTEES or any of their associates, when identified, are participants in the conversation, unless it is determined through the portion of the conversation already overheard that the

conversation is criminal in nature. Even if one or more of the named
TARGET INTERCEPTEES or associates, when identified, is a participant
in the conversation, monitoring will be suspended if the conversation is not
criminal in nature, otherwise related to the offenses under investigation, or
privileged. However, even if monitoring is suspended, the agents will, from
time to time, spot monitor to ensure that conversations that are authorized
to be intercepted have not begun or resumed. Special care will be taken to
ensure that no privileged communications will be intercepted.

Govt. Ex. 1, at S000593.[1]  See also, Govt. Ex. 2, at S000520. The Order issued by Judge

Webber similarly required that these minimization procedures be followed. Govt. Ex. 3

at S000508-509. The Order also required the filing of reports every 10 days, showing the

progress made toward the achievement of the authorized objectives and the need for

continued interception. Id., at S000509.

    Pursuant to the directive in the statute and Judge Webber's Order, and prior to the

activation of the monitoring, SA Volk and AUSA John Ware conducted a "minimization

meeting," at which all of the monitoring agents were present. SA Volk, who was

supervising the wiretap surveillance, was familiar with the statutory minimization

requirements. He had served as the supervisor of wiretap surveillances approximately 10-

12 times previously, and guessed that he had participated in approximately 30 wiretap

cases as a non-supervisor. Prior to the meeting, a letter entitled "Guidelines for the

Conduct of Electronic Surveillance Cellular Telephones (314) 799-4874 and (314) 369-

8546" (the "Guidelines") was drafted by AUSA John Ware. Govt. Ex. 4. A copy of the

---

[1] The government's exhibits are contained in a binder and the pages of the exhibits
are stamped, as Nos. S000503 - S000811. Because the numbering from one exhibit to the
next is often not sequential, the undersigned will reference both the exhibit number and
the stamped page number.

Guidelines was given to each of the monitoring agents and reviewed with them at the meeting. The agents were told to ask questions if they did not understand anything in the Guidelines, and each of the monitoring agents was required to sign a sheet indicating that he or she had read and understood the Guidelines. See Govt. Ex. 4, at S000711. A copy of the Guidelines was also maintained in the monitoring room.

The Guidelines discuss all aspects of the wiretap, including the recording of any monitored interception and the preparation of a written memorandum contemporaneous with the overhearing of a conversation. Detailed minimization requirements are thoroughly explained in writing in the Guidelines. The Guidelines discuss spot monitoring for a reasonable period of time, not to exceed two minutes, to determine whether any of the target subjects were present and participating in a conversation. If a target was engaged in a conversation, the interception could continue for a reasonable time, usually not in excess of two minutes, to determine whether the conversation concerned criminal activities. The spot monitoring could occur as often as reasonable, but in any event at least one minute was to elapse between interceptions. If, during the spot monitoring, it was determined that different or additional individuals were engaged in criminal conversation, the monitoring could continue despite the fact that a named subject was not engaged in the conversation.

After the monitoring began, SA Volk reviewed the monitored conversations on a daily basis, and he continued to evaluate the decisions of the monitoring agents regarding whether conversations were pertinent. In addition, he and the monitoring agents regularly had conversations to discuss who appeared to be involved or not be involved in the

activity under investigation, and developments were noted on an easel that was stationed in the monitoring room.

SA Volk testified that every effort was made to fulfill the minimization requirements. He noted, however, that many of the conversations were very short, making minimization impractical. During the course of the interception, he believed that approximately 30% of all intercepted calls were minimized. The time it took to determine whether a conversation was relevant, however, varied. Sometimes the topic of the conversation was ambiguous, and the parties to the conversations often used code words. Indeed, Sayel Salman's use of code words was evidenced in his earlier conversations with Elias Ponce, which were intercepted pursuant to the prior Texas wiretap order and summarized in the affidavit in support of the application for the instant order.

Monitoring began on November 21, 2003. Govt. Ex. 13, at S000596. Ten-day reports of the monitoring were filed with the District Judge on December 2, December 17, and December 22, 2003. Govt. Exs. 13, 14 & 15. On January 9, 2004, an application and affidavit were filed in support of the continued interception of Telephone #1 and Telephone #2. Govt. Exs. 8 & 9. Based on that application, the Honorable Henry E. Autry entered an Order on January 9, 2004, authorizing continued interception for up to 30 days. Govt. Ex. 10. Thereafter, the fourth and fifth 10-day reports were filed. A sixth and final 10-day report was filed on February 9, 2004, covering the ten-day period from January 29, 2004 through and ending February 7, 2004. Govt. Exs. 16, 17 & 18.

During the first reporting period of November 21, 2003 through November 30, 2003, 29.73% of the completed calls were minimized on Telephone #1 (799-5874), and

5.42 % of the completed calls were minimized on Telephone #2 (369-8546). As set forth more fully in the summaries, numerous calls were monitored on both lines in which Sayel Salman appeared to be arranging or discussing narcotics transactions. These calls included a conversation between Sayel Salman and someone believed to be his other brother, Mohamed Z. Salman.

Among the calls monitored on Telephone #1 was a call on November 30, 2003, at 2:05 p.m., from Defendant Scott Salman to Sayal Salmon, which is the first interception challenged by Defendant. As summarized in the 10-day report, Defendant Salman advises his brother, Sayel, that he is still in Ohio, but wants to come down today. He says he wants to drive down. When Sayel Salman asks what the problem is, Defendant Salman says, "I ain't got not cheddar, yeah, I spent it all last night," and states that he spent $300. The conversation continues with a discussion of whether Defendant Salman should drive or fly down. At one point Sayal Salman states, "Reason why, is you know, if you fly, meet you like Tuesday or Wednesday, I'll be able to give you, you know, I'll be able to give you a couple of stacks. O'boy, O'boy just left not too long ago." Defendant Salman responds, "Oh yeah? Cause I need some work, man." Sayel Salman responds, "Well that's what I mean." Defendant Salman then asks, "Can I come help you out?" Sayel Salman responds, "Yeah, that's fine, but I mean, I don't want you to think that I can give you, you know, I mean a couple." Defendant Salman agrees with this and they agree that Defendant Salman will fly to St. Louis. Govt. Ex. 13, at S000603-04. Although neither party could advise the Court at the hearing of the exact length of this conversation, SA Volk testified that the call was short in duration.

Based upon their investigation and interceptions, the agents believed that in this conversation the Salmans agree that Defendant Salman would fly to St. Louis and receive a portion ("two stacks" or "a couple") of a drug shipment that Sayel Salman was expecting from Elias Ponce on Tuesday, December 2, 2003, and that Defendant Salman would receive " a couple" and drive back to Ohio to "work."   Consistent with this conversation, at 3:27 p.m. on November 30, 2003, Sayel Salman called Southwest Airlines on Telephone #2 and made a reservation for Defendant Scott Salman to fly one way from Columbus, Ohio, to St. Louis on December 1, 2003.  Id. at S000609.[2]

During the 10-day period from December 1, 2003 through December 10, 2003, 25.47% of the telephone calls were minimized on Telephone #1, and 11.13% of the calls were minimized on Telephone #2.  At 1:37 p.m. on December 1, 2003, a call was monitored between Sayel Salman and Elias Ponce on Telephone #1, in which it is believed Ponce advises Sayel Salman that a drug shipment will be leaving El Paso at 3:00 MST, and that a second shipment will leave for St. Louis at 7:00 p.m. MST, which would be 6:00 p.m. CST.  A few minutes later, the second call challenged by Defendant Salman herein was monitored.  This conversation took place at 1:42 p.m., between Defendant Salman and Sayel Salman, on Telephone #1 .  As summarized in the 10-day report, Defendant Salman advised Sayel Salman that he should arrive in St. Louis around 6:00 p.m. and asked, "What's going on?"  Sayel Salman responded, "I'm just chilling," and

---

[2] Defendant Salman initially sought suppression of Sayel Salman's telephone call to Southwest Airlines, as well, but withdrew his challenge to the interception of this call at the hearing.

said, "They are going to be on their way at six o'clock." Defendant Salman responded, "Yeah, I know, I'm trying to get there, I'm trying to get there." Sayel Salman responded, "Ah, no, I mean it's all gravy. I mean, at best they are going to be here tomorrow evening." Govt. Ex. 14, at S000616.

### B. Identification of Defendant Williams

Agent Streck was also involved in the investigation of Sayel Salman and others and in the monitoring of telephone calls in December 2003. At that time, Defendant Williams was apparently a target or subject of the investigation, and his drivers' license photograph, enlarged to approximately the size of an 8½ x 11" sheet, was posted along one wall of the monitoring room, together with the photographs of approximately five other individuals. There were photographs of other individuals along another wall of the room. Because he was engaged in monitoring telephone calls, Agent Streck would have seen the photographs daily.

On December 3, 2003, approximately 12 days after the monitoring began, Agent Streck was conducting surveillance at Sayel Salman's house on Paul Avenue, in Florissant, Missouri. At approximately 12:00 noon that day,[3] he observed Sayel Salman and Scott Salman, leave the house. Sayel Salman got into a Toyota Sequoia, and Scott Salman got into a black Chrysler Sebring automobile. They both drove to a Walgreens parking lot at Halls Ferry and Jennings Station Road and parked. Defendant Scott Salman then got into the passenger seat of Sayel Salman's Toyota. At that point, an

---

[3] The exhibit attached to the government's post-hearing memorandum reflects that the Salmans left the house at 12:45 p.m. (Doc. No. 92, Att. 1).

individual Agent Streck identified as Defendant Daryl Williams came onto the parking lot. Williams got into the Sebring Defendant Salman had driven to the parking lot, backed off of the parking lot, and drove north on Jennings Station Road.

Agent Streck had not seen Defendant Williams in person prior to this time. While he was at the parking lot, Agent Streck was moving around, and at times was between 50 and 100 yards away from the individuals. He had binoculars, which he used to observe these events. He also had a camera that he attempted to use, but because it was the middle of the day and at a busy intersection, he was not successful in obtaining many photographs. When Defendant Williams drove off the lot, Officer Streck was in his own car, and Defendant Williams passed him at a distance of approximately five feet away.

Agent Streck continued to follow the vehicle. Williams drove to 9172 Longridge Road and backed the Sebring up to the residence. Agent Streck drove by the residence and was able to see Defendant's face as he was getting a duffle bag out of the trunk and shutting the trunk. Officer Streck identified Defendant Williams in court as the person he had seen on December 3, 2003.

### CONCLUSIONS OF LAW

**A.  Defendant Salman's Motion to Suppress Intercepted Telephone Calls**

Defendant Salman seeks suppression of two telephone calls intercepted during the course of the wiretap. The first is the telephone call made by Defendant in Ohio to Sayel Salman on Telephone #1 on November 30, 2003, at 2:05 p.m. The second is the conversation between Defendant and Sayel Salman on Telephone #1 on December 1, 2003, at 1:42 p.m. Defendant asserts that the agents should have minimized both of these

calls once they determined that the calls were with Defendant and involved his travel to St. Louis.

Title III imposes various post-authorization duties, including conducting the interception so as to minimize the interception of conversations that are not covered, filing periodic reports with the court, sealing the documents and recordings, and sending an inventory or notice to those whose conversations are intercepted. With respect to the minimization requirement, 18 U.S.C. § 2518(5) provides:

> Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . . In the event the intercepted communication is in code or foreign language and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

Judge Webber's Order authorizing the wiretap contained minimization requirements, and Defendant has not challenged the adequacy of these requirements. Govt. Ex. 3, at S000508-509. In this regard, the Court notes that "a party challenging the validity of a federal wiretap order must show a substantial, not just technical, deviation from the requirements of the statute. United States v. Fairchild, 189 F.3d 769, 774 (8th Cir. 1999). Here no basis exists for asserting that the minimization requirements contained in the Order fail to comply with the statute.

Defendant asserts, however, that the government failed properly to apply the minimization requirements. Arguing that the government had no reason to suspect that Defendant Salman was involved in the narcotics activity, Defendant contends that upon

hearing that the conversation pertained to Defendant visiting his brother, itself a common family occurrence, the call should have immediately been minimized.

Whether the government has complied with the minimization requirements of § 2518(5) is determined by an objective, reasonableness standard. <u>Scott v. United States</u>, 436 U.S. 128, 137-38 (1978); <u>United States v. Williams</u>, 109 F.3d 502, 507 (8th Cir.), <u>cert. denied</u>, 522 U.S. 917 (1997). Factors to be considered include "'the scope of the enterprise, the agents' reasonable expectation of the content of a call, the extent of judicial supervision, length and origin of a call, and use of coded or ambiguous language.'" <u>Williams</u>, 169 F.3d at 507 (<u>quoting</u> <u>United States v. Macklin</u>, 902 F.2d 1320, 1328 (8th Cir. 1990)). More extensive monitoring is reasonable when "the conversations are in the jargon of the drug trade." <u>Id.</u>

In this case, the record demonstrates that the government took the steps necessary to properly implement the minimization requirements. The Assistant United States Attorney provided the agents with detailed directions of the procedures, both orally and in writing. Each monitoring agent was required to read the Guidelines and sign a statement affirming that he had reviewed and understood the minimization procedures. The monitored calls and the agents' decisions with respect to minimization were reviewed on a daily basis by an experienced supervising agent. Defendant has not attempted to show a general pattern or practice of these agents listening to more than they should have, and from the evidence it appears that the minimization procedures were generally followed. During the first 20-day period, when these calls occurred, between 25%-30% of all completed calls on Telephone #1 were minimized.

Application of the factors identified in <u>Williams</u> also demonstrates reasonable compliance with the minimization requirements. The scope of the enterprise under investigation was fairly extensive, with at least eight known participants, and other participants whose identities were, as yet, unknown. The agents were briefed on what to expect in the calls and actually had a preview of the nature of conversations between Sayel Salman and Ponce based on conversations intercepted during the course of the earlier Texas wiretap on Ponce's telephone. Developments were discussed among the monitoring agents on a regular basis and were noted on an easel in the monitoring room for all the agents to see. There was also extensive judicial supervision. Ten-day reports were filed and approved by the Court. Indeed, a detailed description of the November 30 telephone call was provided in the first 10-day report, which report was reviewed and approved by Judge Webber on December 2, 2003. Govt. Ex. 13, at S000599, 603-04. Likewise, a full description of the December 1, 2003, telephone call was provided in the second 10-day report, which report was thereafter approved by Judge Webber. Govt. Ex. 14, at S000614, S000616. Moreover, the Court notes that the first call challenged by Defendant, made on November 30, 2003, was apparently fairly brief, which would have made minimization less feasible. And the parties to the conversations frequently spoke in code, which necessitated more extended monitoring of the calls.

Nevertheless, Defendant asserts that the agents should have minimized the first call as soon as they determined that the caller was Scott Salman, and that he was calling about coming to St. Louis. The Court, however, does not agree. Although Defendant Salman had not previously been identified as a participant, the agents had reason to

suspect family involvement. They had evidence that Sayel Salman's other brother was involved. The initial affidavit also disclosed that narcotics transactions had apparently occurred at a family store and that Sayel Salman had previously arranged for his mother to make deposits or fund transfers for Ponce. Govt. Ex. 1, at S000540, S000573-74. In addition, the first conversation, on November 30, was brief, focused almost entirely on the travel, and involved a request for payment by Sayel Salman, all of which reasonably appeared more consistent with arranging "business" travel than a social family visit. After the first conversation, the content of which reasonably appeared to involve Sayel Salman's narcotics activities, and Sayel Salman's purchase of a one-way ticket to St. Louis for Defendant, it was reasonable for the agents to believe that the call on December 1, 2003 might also be related to the drug conspiracy.

Based on the totality of the factors, the Court finds that no basis exists for suppressing the two telephone calls intercepted between Defendant Salman and his brother.

### B. Motion of Defendant Williams to Suppress Identification

Defendant Williams has filed a motion to suppress the identification of Defendant made by Agent Streck. A defendant's constitutional right to due process may be violated by pretrial confrontation procedures that are unnecessarily suggestive and conducive to an irreparably mistaken identification. Stovall v. Denno, 388 U.S. 293, 302 (1967). Because it is the likelihood of misidentification that violates the right to due process, the court's inquiry focuses on the reliability of the identification. Neil v. Biggers, 409 U.S. 188, 198 (1972).

Any analysis of identification testimony involves a two-step approach. First, the court must examine whether the identification procedures used were unduly suggestive. Biggers, 409 U.S. at 198-99; United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003). Second, if the procedures used were unduly suggestive, the court must then look to the totality of the circumstances to determine whether the identification testimony is nevertheless reliable. Manson v. Brathwaite, 432 U.S. 98, 116 (1977). See Williams, 340 F.3d at 567 (court examines "totality of the circumstances to determine whether the suggestive procedures created 'a very substantial likelihood of irreparable misidentification.'") (quoting Simmons v. United States, 390 U.S. 377, 384 (1977)). In determining whether the identification is sufficiently reliable, the court may look to such factors as the witness's opportunity to view the defendant, the witness's degree of attention, the accuracy of any prior description given by the witness, the witness's level of certainty in his or her identification, and the length of time between the occurrence described and the confrontation. Manson, 432 U.S. at 115; Williams, 340 F.3d at 567; United States v. Johnson, 56 F.3d 947, 953-4 (8th Cir. 1995). The identification testimony may be admitted if the reliability of the identification judged by the above factors outweighs the effect of any undue suggestion. Id. Each case must be reviewed on its own facts. See Manson, 432 U.S. at 114.

Defendant claims that the fact that Agent Streck repeatedly viewed a photograph of Defendant in the monitoring room made his subsequent in person identification of Defendant unduly suggestive. Inasmuch as Defendant is asserting that the earlier viewing of the Defendant's photo had an undue influence on the agent's later observation and

identification of Defendant, the case is somewhat different from most others; the more common scenario addressed by the courts involves an initial in-person viewing, followed by a lineup or identification from a photo array shown for identification purposes only. However, two courts, including the Eighth Circuit, addressed a scenario similar to this. Both courts rejected the argument that an on-the-scene identification of a defendant by a police officer was rendered unduly suggestive by the officer having previously examined a photograph of the defendant in connection with the investigation. See United States v. Rodrequez, 859 F.2d 1321, 1325-26 (8th Cir. 1988), cert. denied, 489 U.S. 1058 (1989); United States v. Brown, 217 F.3d 247, 260 (5th Cir. 2000) ("Agent McDonough's identification testimony [of Charles Brown] was not tainted by an impermissibly suggestive procedure. She identified Charles [Brown] from a photograph that she viewed before her crack purchase from Charles [Brown] and not after . . . ."), vacated on other grounds, Randle v. United States, 531 U.S. 1136 (2001) (Apprendi grounds, as to co-defendant). See also, United States v. Mathis, 264 F.3d 321, 330-32 (3d Cir. 2001), cert. denied, 535 U.S. 908 (2002) (identification from photo array not suppressed where officer saw photo of the defendant amongst numerous photographs of suspected bank robbers one month before observing the defendant in connection with the robbery at issue, and thereafter identified the defendant from photo array following the incident).

Even if the Court were to assume that the identification process was unduly suggestive, identification by a trained law enforcement officer based upon a single photograph does not, itself, render the identification unreliable. See Manson, 432 U.S. at 114-117; United States v. Bissonette, 164 F.3d 1143, 1145-46 (8th Cir. 1999). Examining

the factors identified in <u>Manson</u> and <u>Biggers</u>, the Court finds that the identification by Agent Streck is sufficiently reliable for admission.[4]  Agent Streck is a trained investigator. On the date in question, he had the opportunity to observe Defendant three separate times – while Defendant was in the parking lot, as he passed Agent Streck in his car, and again when Agent Streck drove past the driveway where Defendant had parked.  Although Agent Streck was between 50-to-100 yards away on the parking lot, his vision was assisted by both binoculars and his camera lens, and as Defendant drove away, he passed within five feet of Agent Streck.  The Court further notes that all of these observations took place during the daytime and that throughout, Agent Streck was paying close attention to Defendant.  Indeed, his responsibility at the time was to observe the incident and pay close attention, and based upon the testimony, it appears that Agent Streck did exactly that.  He was certain of Defendant's identification at the scene, having previously viewed Defendant's photograph, and he unequivocally identified Defendant in court based upon his prior in-person observation of Defendant on December 3, 2003.  In light of all of the circumstances, the Court finds little chance of misidentification, and finds the identification to be sufficiently reliable for admission.  <u>See</u> <u>Williams</u>, 340 F.3d at 567 (identification reliable where officer making controlled buy from the defendant's sister viewed the defendant from 8-10 feet away, in hallway of apartment, during daytime, and

---

[4]  To the extent that deterring unduly suggestive identification procedures by the police remains a consideration, <u>see</u> <u>Manson</u>, 432 U.S. at 112, the Court notes that the agents had  legitimate law enforcement reasons for displaying the photographs of those believed to be involved in connection with their overall investigation.  <u>See</u> <u>Brown</u>, 217 F.3d at 260; <u>Rodrequez</u>, 859 F.2d at 1326.

being a veteran officer "frequently involved in controlled purchases with persons whom he has never seen . . . surely employed his highest degree of attention throughout the controlled purchase"); United States v. Tucker, 169 F.3d 1115, 1118 (8th Cir. 1999) (officer's 15-second observation of the defendant in another car while rounding corner sufficiently reliable).

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Daryl Williams' Motion for Leave to File Additional Pretrial Motions [Doc. No. 69] is **denied**.

**IT IS HEREBY RECOMMENDED** that Defendant Scott Salman's Motion to Suppress Electronic Evidence [Doc. No. 63] be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant Daryl Williams' Motion to Suppress Identification [Doc. No. 89] be **denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 23rd day of May, 2005.